Our next case is No. 24, 1692, Afolayan v. Department of Justice. Okay, Ms. Macielo. May it please the Court, Nicole Macielo for Petitioners. Sixteen and a half years ago, Nate Afolayan, a husband and father, tragically passed away while serving his country. He died at the end of a mandatory time training run on a hot day with low humidity in a location at high altitude. This is precisely the type of injury for which Congress intended to provide a benefit when it passed the Public Safety Officers' Benefit Act. Really? What's the evidence of that? If you look at the statute, Congress— It says personal injury, right? It does say personal injury, and the statute specifically says a public safety officer has died as a direct and proximal result of a personal injury sustained in the line of  You know, the definition from blacks doesn't sound like climate conditions. It does not sound like climate conditions, but heat illness does fall within that definition from blacks. Blacks says an injury speaks to a traumatic condition of the body, and that's what happened here. If you look at the words Congress used, it just—it had to be a personal injury, and the officer died as a direct and proximate result of that personal injury. So under that statutory text, what happened here would fall within those terms. You've relied on the regulation that refers to climatic conditions, right? That's your primary argument. So our—we have multiple arguments here. First, we believe that the regulation that lists climatic conditions as one of the requisite causes of injury here is not in line with that statutory text. If you look at the statute, and especially after Loper-Bright, just— Regulations reference to climatic conditions is impermissible under the statute? We think if you look at the— Is that what you're saying? Yes, that is one of our arguments here. If you— What if the regulation didn't mention climatic conditions at all? Would that violate the statute? So if the regulation—to back up a bit, we believe that the Bureau overstepped what Congress gave it authority to do when it listed here— You didn't think Congress gave them the authority to define what constituted a personal injury? No. So if you look at the Public Safety Officers Benefit Act statute, there is a definition section there where Congress defined a number of terms. And where did they define personal injury? They did not feel the need to because they meant that term to have its plain meaning. And they meant— Didn't they delegate a lot of authority to the BJA to implement the statute? And wouldn't that normally include defining what a personal injury is? So I think Loper-Bright actually speaks to this question. In there, the Supreme Court talked to different types of delegations of authority. If you look at the delegation here, Congress wrote that the Bureau is authorized to establish rules that may be necessary to carry out the purposes of the subchapter. That's very similar to the delegation that was at issue in Loper-Bright. The Court specifically discusses in Loper-Bright there are statutes where Congress says— I'm not sure why this argument you think is helping you because the regulation includes climactic injury or climactic conditions, which is what you're relying on. I mean, to me, if we're just looking at personal injury, the weather doesn't count at all. So if you're asking me to just look at the statute and determine whether these kind of weather conditions can be an injury, I would say no. I think your argument has to be that this regulation, they decided that climactic conditions could, in certain circumstances, constitute an injury. Well, our argument is that if the agency for whom you're working subjects you to an intensive training exercise in high heat, and heat illness is a foreseeable direct result— There's no evidence this was high heat. Quite the contrary. It says it's not unusual. So, 88 degrees, we would submit is high heat. Even if you look at the regulation and we accept that the regulation is a valid exercise of discretion under the statute— So are you saying, are you agreeing then that climactic conditions has to be something other than ordinary weather? We, to some extent, yes, in terms of— What does that mean? It's either yes or no. Is it if, you know, it's a snow, a regular snowy day, maybe not the last week we've had here, but a regular snowy day and somebody's out chasing somebody and falls on the snow and tragically hits their head and dies, is that climactic conditions? We would submit that under our view, as statute is, under the government's view, it may not be. So your view is it's, well, regular weather then is good enough? We think— Say we're in Buffalo. It snows all the time in Buffalo. If somebody, you know, does anything that's connected to snow or ice, even though it's normal weather, that that's an injury. We do think that would be a compensable injury, that someone, if you took any other view, the government could craft—it would just lead to disparate results. Someone could, you know, say in North Carolina, it's just snow. They're not used to snow. Someone who slips on the ice there would have a compensable injury, but the person in Buffalo who suffered the same exact injury wouldn't. Why would the person who slipped on the ice there have a compensable injury unless it was unusually severe weather? If you—so they would have a compensable injury— You've got to look at this in the context of everything else when you're defining injury, and we're talking normally about, you know, gunshots and knife wounds and stabbings and stuff like that. You know, ordinary, you know, weather that's common for the area is, you know, outside of, you know, if you send somebody to Death Valley, that's probably a problem. But this is—this was the weather was ordinary for this area. A little on the high heat, as the Bureau found, but not out of the ordinary. So, I think Death Valley really exemplifies what went wrong. But if Agent Effeline had done his training run in Death Valley, the BGA would have looked at, here's what the weather was like in Death Valley that month. That is what they did here, and that is where we think they went wrong. There is no basis to look— How do you know that that's what they would do with Death Valley? I mean, I had the same thought myself, but I don't know that that's what they'd do with Death Valley. Maybe if the training was in Death Valley and at 110 degrees, this would be a very different case. I don't know that you can assume that that's what they would do. It might be here that what they did is they said, look at the weather, I forget exactly what it was, 80-something? 88. 88. What was it? 88 degrees.  And, you know, they looked at that, but I don't know that we can assume that if it were Death Valley, they would just say, well, it's always 110 in Death Valley. I think that comes back to, if you look at how they're interpreting the words climatic conditions, because here, if on page 6 of their decision below, they went through the average and daily temperature in Artesia, and that is what they looked at here. They didn't just look at, you know, 88 degrees. All they're doing is assuming that the weather there is within normal human, you know, limits, and that it's not impermissible to have people do training exercises. Death Valley is always, by definition, unusually harsh, isn't it? It would be, and I do think here, if you... But if you agree that there's an unusually harsh aspect, then your Death Valley problem goes away, because it's almost always unusually harsh there. So it didn't matter if it's their average temperature. By definition, the average temperature is unusually harsh. Here, it could be unusually harsh, or it could be normal, and the Bureau found it was normal. And don't we review that for substantial evidence? Well, the Bureau found it was normal based on what was usual in that specific location. It wasn't looking at the entire... Right, because it was an area of the country that's not inhospitable to human life. If it's a normal temperature in an area where people live, then it's a normal temperature, and that's not an injury. Well, it is a temperature that... They didn't just look at that either. They looked at sports criteria, military criteria. They didn't just focus on whether this was unusual for this particular geographic area. They looked more broadly at the issue of what's unusual. On that note... Did they also look at where Mr. A. Fuligan lived or grew up? He lived in California. No, but they talked about it. Yes, they did. They talked about how the weather was very similar. And so just one thing I will note in that regard is what the agency did not look at here, and that is the difference it makes when you're at a high altitude. They did not consider what temperature feels like, what low humidity feels like at that 3,400 feet of altitude. If 88 degrees is a hot day, if you look at the statements in the record from his classmates over and over again, they said it was a hot day. When he was brought to the hospital in Artesia, they wrote that he had symptoms of heat illness when he passed away at the hospital in Lubbock, Texas. These are areas that are familiar with the climate there. They again said it was heat illness. Is it a question of substantial evidence, the determination that it was not unusual climatic conditions? I think there is substantial evidence in the record that the climatic conditions, specifically the combination of the three, created. This is a different question. So on appeal, our job is to review whether there's substantial evidence to support the fact findings of the tribunal below. And here, the specific one we're talking about is that fact finding that there weren't unusual climatic conditions. Is there substantial evidence to support that finding that it wasn't unusual? That's the question that we have to consider, right? It's a hard burden for you, to be honest. It is. And if you look at things in a vacuum, whether the weather was just looking at the specific temperature and humidity in Artesia on that specific day, if that was unusual, the evidence may point to that. But that, again, takes a step away from both the statute that Congress wrote and the regulations as they are written. And even further, while you do look at that finding for substantial evidence, the record also shows that the agency failed to consider, as mentioned, the important consideration of how altitude specifically comes into play here. That high altitude makes temperatures feel different. It has a different impact on the body. And that's something that the agency failed to consider. It did not specifically take that into account. And again, if you go back to either the statute that Congress wrote or the regulation that the Bureau enacted, there's just no basis from the text of either the statute or the regulation to get into this sort of hair splitting of what was the temperature like in this specific location. At the end of the day, if you look at, it was a hot day by all accounts. He died from heat illness by all accounts. And the government is asking you to determine whether that was 51 percent cause of death or 49 percent. That is just divorced from what Congress wrote and what the agency passed. And I see I'm into my rebuttal time. All right, Mr. Long. Good morning, and may it please the court. The key point here is that this is subject to a substantial evidence standard review. Let's back up. Why isn't it the case that it's just by definition an injury if the weather causes the body to react in a way that results in death? Well, if we go back to the court's prior decision, the first time this was here, the focus on I understand. I think it is probably law of the case that it has to be unusually harsh weather. But I am interested in the argument that it's an injury because the weather caused the body to react this way. And I understand there's a whole multitude of arguments that this is not what caused it, all that stuff. But just take hypothetically, if the weather causes somebody to die, why isn't that a compensable injury under the statute? So, I will leave aside the court's prior decision. But I will note one of the things that the court said there was that the purpose of this act is that compensation is limited to unusual circumstances, right? And so I think that the regulatory definition in limiting climatic conditions to that which is unusual out of the ordinary, it's consistent with that in the sense that going on an ordinary training run in an environment where that's routinely done is not the sort of thing that the act is intended to do. If a training run were ordered in Death Valley, that would be a different analysis. But that's not what this case is. So, your view is this unusually harsh is just a consequence of the underlying purpose of the entire statute and that personal injury there may mean something different than just, you know, it may mean in other contexts because this is a special compensation program for people who have suffered traumatic events during the line of duty. Yes. And I think it's not... Suppose, suppose, take the Buffalo Snow example, the officer slips, hits his head and dies as a result of a concussion. That's not a personal injury? That, in that instance, he has slipped and fallen and, I mean, experienced trauma to his head, right?  And so, we understand that that is an injury. We probably could... So, we could recover. That officer could recover under those circumstances. I'd have to think about it more, but I think that the climatic conditions would not be the focus there. It would be the injury to the head. The personal injury was hitting your head and dying. Right. And what we see here... That would be a personal injury. Right. And what we see here if we go forward in the director's analysis is that the director was unable... Putting aside the remand question of unusual, the director was unable to conclude that climatic conditions were unfavorable and that they were a substantial factor in agent athletic injury and death. Is a heat illness a personal injury? I'm not sure that that would fall on the definition of a personal injury. It's not a traumatic injury, really. So, I think that if we look at the director's decision, when we think about heat illness, you need to be more specific about what exactly was occurring and what we understand to have impacted agent F. Leon's body leading up to his crisis. And so, there is a possibility that he had perhaps drank less than normal, if the director notes that. There is some discussion in the record about how he was feeling the days prior. And so, heat illness is sort of a generalized concept, I think, and the director's decision goes into more detail about what exactly was acting on his body and whether anything rose to the level of being a substantial factor. Well, also, doesn't the regulation itself exclude stress or strain on the body from the definition of injury, which is more akin to heat illness, whereas hitting your head is an actual? Right. That's right. I want to think about it more, but I think that that is going in the right direction, Your Honor. Yes. I mean, it's caused by external force, right? That's the definition of injury, and often it's bullets or knives, but the pavement, I guess, could be an external force, too. But then there's the cutout in the definition for stress or strain. Right. I think we've had a lot of cases where sometimes people will have a heart attack and die, and we've found them non-compensable in certain circumstances. Right. And that is the Morrow case, I believe, where an agent had engaged in a chase. This was in 1981 and had a heart attack later, and it was found non-compensable, which was affirmed by this court. So this is a specific program that gives you special compensation for certain injuries, not every time somebody dies during the line of duty, they get a payout. Correct. And there's a long line of precedent, non-presidential case law, and we could go to legislative history and regulatory history to understand that, but that's right. You can see on the face of the statute. No matter how tragic. Right. Oh, absolutely. This is tragic. This is inarguably tragic. It is terrible, but it doesn't mean it's compensable under the statutory regime that Congress has established. If there are no further questions, we ask that you affirm. Okay. Thank you. This is Miss Yellow. Just a few points of clarification, Your Honor. So first, 88 degree heat and low humidity and high altitude are unusual conditions for a time training run in the sun, and the agency here did not say that Artesia was inhospitable as a whole. It just said that those weather conditions were not unusual for the area. But here, for a training run that had to happen at a fast pace, those are unusual conditions, and that is something difficult. You said earlier that there was an error because those conditions weren't considered in combination, but when I look at the opinion at page A14, I see multiple times where the fact finder is saying in combination, in combination. What is your response to that? So the fact finder says they were considered in combination, but if you look at what is actually being said there, they aren't actually being considered in combination. What the fact finder is essentially saying is, you know, 1 plus 2 does not equal 6, 3 does not equal 6. So 1 plus 2 plus 3 does not equal 6. They're saying heat and low humidity are not unusual, altitude is not unusual, so all three of them combined are not unusual. There's nothing in the record that actually dives into how those could have impacted the body, what the temperature and the low humidity made. There's nothing in the record, is there nothing in the record both ways, saying that it's extreme and saying that it's not extreme? That was an overstatement, Your Honor, I'm sorry. There is extra testimony in the record. If you look at Dr. Malusnik-Polchan on page 515 of the record, says the heat, low humidity and altitude combined for a dangerous triad. And I believe the same doctor testified on page 517 that Nate Afalayan was fit, he's used to exercise, the only new variable here was the temperature that day, the low humidity and that this time training run happened at high altitude. And just one other point I wanted to... About the point that similar training runs had been engaged in on prior days and there was no problem. Prior days with similar heat, similar environmental conditions. I don't believe the record specifically says that there were prior training runs that were at that high of temperature. He did go on past prior training runs, but is never our contention and nowhere in the record do we contend that conditions only create a compensable injury if every single person dies under those conditions, if an injury always results from those conditions. It just has to be somewhat perceivable. And just one last thing on that point, you asked counsel on the other side about stress and strain and heart attacks and as mentioned in our 28-J letter and also in the record, the agency has paid out claims for heart attacks and similar injuries. The only difference here is that Nate had sickle cell trait and so the agency saw that as an out and a reason not to pay his family for his death in the line of duty. And I think we're out of time.  Thank you. Thank you. Thank both counsel and case assistant.